[Cite as *In re T.T.*, 2010-Ohio-4175.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN THE MATTER OF:

T.T. (1),

CASE NO. 13-10-15

ALLEGED DEPENDENT CHILD,

O P I N I O N

[DANYL D. - APPELLANT].

---

IN THE MATTER OF:

T.T. (2),

CASE NO. 13-10-16

ALLEGED DEPENDENT CHILD,

O P I N I O N

[DANYL D. - APPELLANT].

---

IN THE MATTER OF:

T.T. (3),

CASE NO. 13-10-17

ALLEGED DEPENDENT CHILD,

O P I N I O N

[DANYL D. - APPELLANT].

---

**Appeal from Seneca County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 20850020, 20850021 and 20850022**

**Judgments Affirmed**

**Date of Decision: September 7, 2010**

Case Nos. 13-10-15, 13-10-16 and 13-10-17

**APPEARANCES:**

*Shane M. Leuthold* **for Appellant**

*Victor Perez* **for Appellee, Department of Job & Family Services**

*James Melle*, **Guardian Ad Litem for Appellant**

*Francis Marley, Jr.* **for T.T. (1)**

*Mary Snyder* **for T.T. (2)**

*Todd Workman* **for T.T. (3)**

*Rebecca Herner* **for CASA**

**WILLAMOWSKI, P.J.**

{¶1} Mother-appellant Danyl D. ("Danyl") brings this appeal from the judgment of the Court of Common Pleas of Seneca County, Juvenile Division granting permanent custody of the children to the Seneca County Department of Jobs and Family Services ("the Agency"). For the reasons set forth below, the judgment is affirmed.

{¶2} On March 10, 2008, Danyl brought her son, Brian T. ("Brian"), D.O.B. July 1990, to the Agency requesting protection for him from his father, Kevin T. ("Kevin"). Assessment investigation worker Carolyn Dorn ("Dorn") met with them and removed him from the home for his own protection. Caseworker Natalie Rhoades ("Rhoades") then went to the home and met with Kevin and the

other children, T.T.1, D.O.B. September 1994, T.T.2, D.O.B. April 1997, and T.T.3, D.O.B. July 2000 (collectively referred to as "the children"). The Agency filed complaints that same day alleging that all of the children were dependent. The Agency sought temporary custody of Brian and protective supervision over the children. On March 11, 2008, the trial court held a probable cause/shelter care hearing. The parties agreed to maintain protective supervision over the children. Brian remained in foster care.

{¶3} On April 1, 2008, the Agency filed a motion for an emergency removal order for the children because Danyl had been hospitalized for mental health issues due to auditory and visual hallucinations and because Kevin had been injecting growth hormones into the wrong child. The trial court granted the motion and a shelter care hearing was scheduled for April 2, 2008. However, the hearing was continued to allow Danyl to have her counsel present.

{¶4} On April 9, 2008, the Agency filed a proposed case plan. The trial court approved it without objection on April 10, 2008. The case plan required Danyl to 1) complete a parenting class, 2) complete a class on budgeting, and 3) have a psychological evaluation and follow all recommendations.[1] On April 11, 2008, the shelter care hearing was held. Dorn testified that Kevin was giving the injections of growth hormones prescribed for T.T.1 to T.T.2 and T.T.3. She

---

[1] The case plan also contained requirements for Kevin, but he is not appealing. Thus, those requirements need not be addressed.

testified that these injections could be harmful to the children. Dorn testified that Kevin reported suffering mini-strokes that left him temporarily deaf, blind and confused. Dorn also testified that she was concerned about Danyl's mental health. Danyl had told her that she saw ghosts in the home and had been hospitalized for mental health reasons. The trial court determined that the concerns about Kevin and Danyl's mental and physical health were justified and that the emergency removal was necessary.

{¶5} On June 5, 2009, an adjudication hearing was held. The parties all agreed to a finding that the children were dependent. The disposition hearing was then held immediately after by consent of the parties. The trial court continued the temporary custody granted to the Agency. The prior case plan was continued, although Danyl was also required to contact the local MRDD agency to determine her eligibility for services. On June 11, 2008, a revised case plan was filed, which required Danyl to 1) complete a parenting class, 2) complete a budgeting class, 3) obtain a psychological evaluation and follow all recommendations, and 4) be assessed for determination of services needed. The case plan also required the agency to provide referrals for services requested by the parents and to assist with transportation to visits if requested by Danyl or Kevin. The trial court approved this case plan without objection on June 20, 2008.

**{¶6}** On September 10, 2008, a review hearing was held. The GAL report recommended that T.T.1 remain in her residential program for treatment and that T.T.2 and T.T.3 remain in their foster placements. On September 29, 2008, an administrative review was filed with the trial court. The review indicated that Kevin and Danyl had not visited with the children since June and had not contacted the caseworker for information on the children. The review indicated that Kevin and Danyl were in counseling, but were not making much progress. They did not initiate contact with the caseworker and blamed the removal on the children, the Agency, or the caseworker. Danyl had enrolled in counseling to address her mental health issues, but was not taking her prescribed medication because she did not think she needed it. Danyl and Kevin had not completed the parenting class. On October 27, 2008, the magistrate filed an opinion which recommended continuing temporary custody and supervised visitation. The trial court adopted the magistrate's opinion on that same day.

**{¶7}** Another review hearing was held on December 15, 2008. The GAL filed her report recommending that visitations be discontinued and that the Agency should seek permanent custody of the children. The Agency informed the court at the hearing that it intended to seek permanent custody. Danyl objected and indicated that she would be seeking legal custody.[2] On March 31, 2009, the

---

[2] The trial court did not enter a judgment from this review continuing the temporary custody of the Agency until July 14, 2009.

Agency filed the semiannual review completed on March 26, 2009. The review indicated that Danyl and Kevin had not participated in any services since the last review. Danyl had been discharged from counseling for non-compliance and had not visited the children since June of 2008. In the two prior months, Danyl had made no contact with the caseworker concerning her children. Danyl had quit attending counseling appointments and had not contacted her caseworker since December 2008. Based upon the lack of progress, the Agency again indicated that it would be seeking permanent custody of the children.

{¶8} On June 22, 2009, the Agency filed motions seeking permanent custody of the children. The Agency then filed amended motions seeking permanent custody on August 13, 2009. The amended motions indicated that Danyl had not visited with T.T.2 and T.T. 3 since June of 2008, had not visited T.T.1 since October of 2008, and had not had any contact with any of the children since she sent letters to the Agency for them in March 2009. On August 18, 2009, Danyl filed a motion seeking legal custody of the children. On September 28, October 9, and October 14, 2009, the permanent custody hearing was held. Prior to the hearing, Kevin surrendered his rights and was no longer a party to the hearing. The GAL filed her recommendation that the Agency be granted permanent custody because Danyl had not complied with the case plan and was not capable of effective parenting.

{¶9} Karen Baldy ("Baldy"), the foster mother for T.T.1, testified that when T.T.1 came to her, she had severe issues with personal hygiene. Sept. 28, 2009, Tr. 22. T.T.1 did not know how to properly wash her hair, wash her body with soap, brush her teeth, and properly use toilet paper. Id. At that time, T.T.1 was fourteen years of age. Id. Since being in the foster home, she has made progress on personal hygiene and started taking pride in her appearance. Id. at 23. T.T.1 also had improved in manners by using utensils and a napkin and not eating with her fingers. Id.

{¶10} T.T.1 unfortunately had gotten worse in her aggressive behavior and would physically strike out at family pets, other children and Baldy. Id. at 23-24. T.T.1 had informed Baldy that she had previously killed baby kittens while in her parents' home. Id. at 24. Baldy testified that T.T.1 could not be left unsupervised with any living thing that is smaller than her. Id. T.T.1 had problems with lying about others when they make her mad, just to get them in trouble. Id. at 25. T.T.1 is in weekly counseling, but the effect was limited. Id. at 27. T.T.1 also speaks frequently about the voices she hears in her head and the things that she sees that do not exist. Id. The voices apparently tell her to do "bad things." Id. at 28. T.T.1 will also pick at her fingers or bite herself until she has drawn blood. Id. at 27-29.

{¶11} Baldy is responsible for making sure that T.T.1 takes her medication because T.T.1 would not do so unless told. Id. at 45. T.T.1 lacks all concept of time. Id. T.T.1 has told her that when she turns 18, she is going to return home and open a lemonade stand. Id. at 47. T.T.1 lacks understanding of the proceedings and believes that she is going home merely because she wants to do so. Id. at 49. T.T.1 frequently expresses the desire to go home. Id. at 43-44. T.T.1 will likely never be able to completely care for herself. Id.

{¶12} On cross-examination, Baldy testified that no visits had been arranged between T.T.1 and Danyl while in Baldy's care. Id. at 54. She also testified that Danyl had never called or sent cards. Id. at 56-57. As far as she was aware, there had been no contact between T.T.1 and Danyl. Id.

{¶13} Shirley Smith ("Smith"), the GAL, testified that she had investigated the situation. Id. at 63. She testified that T.T.1 told her she wanted to go home, but T.T.2 and T.T.3 both wished to be adopted. Id. at 63-64. Although the children are close emotionally, they cannot be placed together due to their behaviors. Id. at 64. Smith also testified that Danyl had contacted her about a birthday gift for T.T.3 in September of 2008. Id. at 67. Smith went to the home and picked up the gift, but Danyl did not ask her about the children. Id. at 68. In 2008, Danyl did call one other time and ask how the girls were doing. Id. at 69.

Danyl contacted Smith twice in 2008 to discuss visitation. Id. at 70. She did not contact Smith at all in 2009. Id.

{¶14} Smith testified that Baldy's testimony concerning T.T.1 was not surprising. Id. at 71. She believed that the girls need permanency in order to progress further. Id. at 72. In her opinion, it would not be safe to return the children to Danyl. Id. at 73. She had been to Danyl's home, but had only seen the first floor. Id. T.T.2 and T.T.3 no longer identify "home" as being with Danyl. Id. at 76. The basis for her opinion as to the children's safety was that the children left the home with poor personal hygiene, lice, underweight, no clean clothes, and a lack of food. Id. at 77.

{¶15} When questioned about the case plan, Smith testified that Danyl had not participated in any parenting class and has not indicated that things would be different if the children were returned. Id. at 77-84. Danyl had the opportunity to visit with the children, but did not complete the orientation at Patchworks, so could not visit. Id. at 81. Smith testified that in her opinion, Danyl could not care for T.T.1. Id. at 85. She also testified that the children could not be returned home because Brian was back in the home. Id. at 86. T.T.2 and T.T.3 both indicated to their foster parents that Brian had sexually abused them. Id. Both girls reported having told their parents about the abuse, but nothing was done to stop it. Id. at 88.

{¶16} Daniel Cruikshanks ("Cruikshanks") is the psychologist who performed the psychological evaluation of Danyl. Cruikshanks testified that Kevin would not allow Danyl to be interviewed without him present. Id. at 117. When Cruikshanks finally was able to speak with Danyl alone, Kevin was unhappy and hostile. Id. at 118. The cognitive testing of Danyl showed that she was in the borderline intellectual functioning range. Id. at 121. However, during the testing, Cruikshanks received the impression that she was deliberately trying to lower her score. Id. Her IQ ranged between 64 and 76. Id. at 122. In his opinion, Danyl's intelligence is below average and she is profoundly limited in her learned skills, such as math and language. Id. at 123. Danyl's ability to comprehend and understand general information is extremely limited. Id. at 125. Pursuant to the tests performed by Cuikshanks, Danyl is diagnosed with 1) schizophreniform with likelihood that it would evolve into schizophrenia, 2) shared psychotic disorder, and 3) mild mental retardation. Id. at 128-34. Cruikshanks also testified that she had some issues with being sexually abused by Kevin, neglect of her children, ignoring the sexual abuse of her children, and in dealing with the family problems. Id. at 134. In his opinion, Danyl is a victim of Kevin's domineering personality as are the children with instances of physical, mental and sexual abuse occurring. Id. at 136-37. Danyl is not capable of caring for herself without assistance. Id. at 138. Cruikshanks also testified that Danyl actually believed that Brian was the

antichrist, that he was possessed by Satan, and that he was trying to destroy the home. Id. at 140. However, she did nothing to protect the children from Brian. Id. at 141. The Global Assessment Functioning ("GAF") score for Danyl was 35, which indicates a person with serious problems that prevent them from functioning well enough to care for themselves or anybody else. Id. at 142. People with this score have difficulty meeting their basic needs, such as hygiene or feeding. Id. at 143. If Danyl were not seeking treatment for her schizophreniform, Cruikshanks did not believe that Danyl's mental illness would improve. Id. at 144. He concluded that "in my judgment it would be – it would be very difficult, if not impossible for her to provide adequate, an adequate environment for her children." Id. at 145.

{¶17} Cruikshanks also testified as to the capabilities of the children. T.T.1 was diagnosed with 1) shared psychotic disorder, 2) disruptive behavior disorder, 3) overanxious disorder of childhood, and 4) a mood disorder. Id. at 146. He noted that T.T.1 had been a victim of neglect and likely of sexual abuse. Id. at 147. She tested as mentally retarded and had anti-social characteristics. Id. Finally, her GAF score was 30, which means she is as severely limited as her mother in her ability to care for herself. Id. T.T.2 was diagnosed with post traumatic stress disorder and shared psychotic disorder. Id. at 153. T.T.2 was also indicated as being the victim of neglect and sexual abuse. Id. T.T.3 was

diagnosed with a shared psychotic disorder, post traumatic stress disorder and a transient tic disorder. Id. at 156-57. In addition, T.T.3 was also indicated to have suffered from neglect and sexual abuse. Id.

{¶18} Based upon his interviews with the family members, the test results, and his review of the file provided by the Agency, Cruikshanks testified that his opinion has not changed from that given in his report. Id. at 159.

> **To spend time with [this] family is to step into a surrealistic and bizarre world characterized by ghosts, demons, obsession, paranoia and confusion.**
>
> **\* \* \***
>
> **[This] family is *the most disturbed family I have seen* in my many years as a clinician and forensic evaluator. While [Kevin] and [Danyl] attempted to present themselves as victims of their Satan worshiping, demonic son, it is clear that the four children evaluated here are the actual victims of years of neglect and abuse by their parents. Despite numerous contacts with [the Agency] and many opportunities to get help, it is clearly evident that the couple has repeatedly failed to meet even the most basic needs of their children.**
>
> **\* \* \***
>
> **Recommendations:**
>
> **Beyond his financial interest in [T.T.1] (SSI Disability), [Kevin] does not appear to be interested in or motivated to have contact with or custody of his children.**
>
> **Contact between [Kevin] and his children should be considered *potentially harmful to them*. Contact *in any form* with his children is *not recommended*.**

**[Danyl] is as much a victim as a perpetrator in this case. She needs help.**

**Ideally, [Danyl] would benefit by separation from [Kevin]. With assistance and assurance, she might accept the opportunity to go out on her own.**

**[Danyl] is seriously mentally ill. She is in need of a psychiatric consult and routine (monthly) visits to find and manage effective medication treatments. In addition, [Danyl] would benefit from weekly counseling and case management with special emphasis on life skills. [Danyl] needs assistance developing a sense of "self" as an autonomous individual. Given the diagnostic profile and prognosis, [Danyl] likely will require psychiatric and psychological intervention for the rest of her life. \* \* \***

**[Danyl] will benefit from continued follow-up with [the Agency] to monitor progress on treatment. *There are no circumstances under which [Danyl] would be capable of caring for her children adequately*; however, supervised visitation (without [Kevin]) would be acceptable provided *either her psychiatrist or counselor can attest that her psychosis is controlled and she is mentally and emotionally stable.***

Parenting Capacity Evaluation, 10, 56-58.

{¶19} In the summer of 2009, Cruikshanks did a follow-up evaluation on the children. Sept. 28, 2009, Tr. 160. Cruikshanks testified that after a year and a half with the foster families, the children are doing better, even if their behavior is disturbing. Id. at 162. He further testified that it would not be safe to return the children to a home in which Kevin or Brian resided. Id. at 165. He did not believe that Danyl is capable of protecting the children given her own situation.

Id. at 166. In his final summary from the re-evaluation of the children,

Cruikshanks reached the following conclusions.

> **In my original report of September, 2008, I observed that [this] family represented the most severe and disturbing case I had ever seen clinically. In revisiting the [children] one year later, the stories presented for each of them sadly illustrate the terrible long-term impact of prolonged neglect and abuse of children. [The children] remain quite disturbed as a result of the traumas they have suffered. Their foster parents clearly are making every effort to help these children. They are providing good homes with appropriate structure, boundaries and rules. The girls are being nurtured and loved and provided everything they need. The girls are receiving appropriate treatments for their mental and emotional problems. Despite these efforts, they continue to present with significant problems, and their foster families are feeling frustrated and overwhelmed by the severity of these cases and demands being placed upon them. I do not believe that these children could be in better hands than those of their respective foster families. That said, I am concerned that each of the foster families might not be able to continue with these children for the duration of their childhoods.**
>
> **With regard to the question of reunification, there are several issues that must be considered. First, based on information from [the Agency], there appears to be little or no evidence that the biological parents have made any efforts to resolve their problems or make changes in their lives that would result in a safe, loving, nurturing environment for their daughters. Second [Brian], now [an] adult, reportedly has returned home to live with his parents. This seems ironic since it was the intense conflict between Brian and his father that initially brought this case to the attention of [the Agency] in the first place. Brian clearly was a victim of abuse and neglect by his parents throughout his childhood; however it is also clear that Brian was a perpetrator of abuse as well. Both [T.T.2 and T.T.3] independently have reported that they were sexually molested by Brian repeatedly over several years, and given the**

**consistency of their stories, and the patterns of behavior now, I have no reason to doubt that this is true. Indeed, I believe that the level of sexual abuse in the home likely was far more significant than the available information suggests. As is clear from my original report, the environment created by the parents is dangerous and deprived. *To reunite the [children] with their parents would be to eliminate any chance they might have for a normal life.***

Psychological/Behavioral Evaluation, 15-16.

{¶20} On cross-examination, Cruikshanks testified that Danyl's mental issues, if untreated, would get worse. Sept. 28, 2009, Tr. 177. With treatment, the condition would not go away, but would improve. Id. at 178. At the time of his interview with Danyl, she was being treated for the schizophreniform with several medications. Id. However, her symptoms were still pronounced. Id. at 179. By the third interview, Danyl reported that she was no longer taking her medications because Kevin did not want her to take the medicine any more. Id. Based upon Cruikshanks' review of the records, Danyl was not able to fulfill her role as a parent and would not ever be able to do so. Id. at 184, 189. This opinion is strengthened by the fact that the children all have their own issues that were challenging to trained foster parents and would be impossible for a parent dealing with her own psychological, intellectual, and emotional issues. Id. at 190. Given all of the difficulties that Danyl faces and the level of difficulties the children have, it would be very problematic for Danyl to care for them. Id. at 197. The

increased stress of dealing with the children would in fact be harmful to Danyl. Id. at 198.

{¶21} Dorn testified that she was the assessment investigation worker in this case. Oct. 9, 2009, Tr. 7. Danyl brought Brian to the Agency because she could not protect him from Kevin anymore. Id. at 10. On March 14, 2008, Danyl called her telling her that she could not raise the girls anymore. Id. at 16. Dorn called Danyl on March 17, 2008, and learned from Kevin that she was having a "nervous breakdown." Id. at 18. Dorn then told Kevin to take her to the hospital, which he did. Id. On March 31, 2008, Dorn learned that Kevin had given hormone growth treatments to the wrong child. Id. at 19. Dorn visited Danyl in the hospital where Danyl informed her that the "ghosts" were bothering her, "they were just messing with her and she was not comfortable at home." Id. at 20. During one of her home visits, Kevin took her to the basement and showed her where the girl ghosts were having their tea parties. Id. at 22. To rid the home of the ghosts, he played Christian music in the basement. Id. T.T.2 confirmed the allegation that Kevin had given her the injection meant for T.T.1. Id. at 25. Then the Agency filed to remove the children from the home. Id. When she removed the children, T.T.1 and T.T.2 were upset and yelling, but T.T.3 merely whispered "Thank you." Id. at 27. Danyl has not expressed to Dorn a desire to see the children. Id. at 39.

-16-

{¶22} Erica Cleveland ("Cleveland") was the caseworker assigned to the children. Id. at 44. She met Kevin and Danyl for the first time at the case plan development meeting in April 2008. Id. at 45. Kevin was mainly upset that since the children were removed from the home, he would not have income or food stamps. Id. at 46. How to get the children back was not the main concern. Id. Danyl went along with everything Kevin said and reiterated his opinions. Id. at 49. The original case plan consisted of parenting classes, anger management for Kevin, and psychological assessment and counseling for Danyl. Id. at 53. Kevin claimed he was unable to work, but never provided any verification. Id. at 54. Kevin treated Danyl like a child and she did everything she was told exactly as she was told. Id. at 55. Danyl told Cleveland that Cleveland would have to speak slowly or repeat herself so that Danyl could understand her because she is retarded. Id. at 57. However, Danyl never indicated that she could not care for her children. Id.

{¶23} After the meeting Kevin and Danyl were assessed at Firelands and were enrolled in services. Id. at 58-59. Danyl was prescribed medication for her mental conditions, but quit taking it in May of 2008. Id. at 59. Kevin did not want her to take the medication, but Cleveland was concerned because Danyl reported seeing ghosts in the home which would tell her to do things and she would do as they instructed. Id. at 60. Kevin played along with Danyl's belief in

the ghosts. Id. Brian also had these delusions and believed that "The Guardian" had followed him to the foster home. Id. at 62. Brian's foster care placement ended when he was placed in a psychiatric hospital because he was engaging in self harming behavior. Id. at 63-64. Once Brian turned 18, he insisted on returning to the home. Id. at 64. Cleveland did warn Danyl that having Brian in the home would affect their ability to get the children returned since allegations of sexual abuse by Brian had been made by the children. Id. at 65. T.T.2 and T.T.3 both reported that they had told Danyl and Kevin about what Brian did. Id. at 71. Danyl and Kevin ignored them. Id. at 72. The family even encouraged T.T.1, 13 at the time, to become pregnant by her boyfriend and have a child. Id. at 74.

{¶24} When the girls were placed into foster care, they were all in one home. Id. at 76. They had to be split up when they were found plotting to run away and threatening each other not to tell the family secrets. Id. T.T.1 and T.T.2 were moved into a therapeutic home together and T.T.3 stayed in the original placement. Id. at 77. T.T.1 was removed from the home into a residential center when she threatened to kill herself and took steps to follow through with the threat. Id. As of October 2009, T.T.2 had been moved to a residential treatment facility to help her learn to manage her behaviors. Id. at 78. T.T.1 had been moved back into the Marsh Foundation after repeatedly assaulting her foster mother and threatening harm to others. Id. T.T.3 has done the best and

was moved to what could be a permanent home in October of 2009. Id. at 79. Since June of 2008, the girls have had no contact with each other. Id. at 79-80.

{¶25} When the children entered foster care, they all had significant issues with hygiene and nutrition. T.T.3, at the age of seven, had to be taught how to use soap and a washcloth, how to wash her hair, and how to use toilet paper. Id. at 82. All of the children were very frail when they entered foster care and would eat three or four helpings of food at a sitting. Id. at 83. In Danyl's home, the girls would share one can of food for a meal. Id. at 84. However, Danyl and Kevin did not appear to go hungry. Id. at 86.

{¶26} In July of 2008, Cleveland spent time alone with Danyl. Danyl told Cleveland that Kevin was abusive and that she wanted to leave him. Id. at 93. Cleveland then told Danyl that she could give her resources to help her get out of an abusive situation if that is what she wanted. Id. Danyl told her she would let her know. Id. As of the hearing date, Danyl has not sought any help to leave Kevin and has not done so on her own. Id. at 94.

{¶27} The case plan required both Danyl and Kevin to seek counseling. Kevin quit attending counseling in November of 2008 after telling the counselor that he was moving out of state and wished to be discharged. Id. at 97. Kevin repeatedly threatened to move to Arizona, but never did. Id. at 98. Danyl attended counseling sporadically for a while. Id. at 97. After missing too many

appointments without cause, she was unsuccessfully discharged. Id. Cleveland discussed the effect on the case of Danyl's failure to attend counseling and to take her medication with Danyl. Id. at 98. Danyl insisted that she was fine without the medicine. Id.

{¶28} In September of 2009, Cleveland made a home visit to Danyl and Kevin. Id. at 99. Brian was still residing in the home as was Kevin. Id. at 100. Danyl did not ask about the children, but did indicate that she had bought some birds for T.T.1 when she comes home. Id. at 101. Danyl did bring out a birthday cake for Cleveland to take to T.T.1. Id. at 102. Kevin did not acknowledge Cleveland's presence in the home. Id. at 103. When Cleveland finally was able to get a response from Kevin, he informed her that he was too busy working on his model train to talk to her about the children. Id. at 106. Due to threats made by Kevin to the safety of Cleveland, she did not make monthly home visits. Id. at 107. Instead, she sent them a letter every month to contact her regarding the case plan. Id. at 108. Cleveland did not receive any responses. Id. From the time the children were removed from the home, Danyl contacted Cleveland three or four times to ask about the children. Id. However, over time, Danyl stopped making contact. Id. at 109.

{¶29} Although Danyl had visits with the children, Cleveland in September of 2008, had requested that visits be stopped. Id. at 111. Cleveland

testified that in her opinion, the visits were harmful in that during and after the visits, the children had significant behavior issues. Id. The trial court did not terminate visits, but did modify them. Id. However, this was moot as Danyl and Kevin did not visit with T.T.2 and T.T.3 after June 2008, and last saw T.T.1 in October of 2008. To visit with T.T.2 and T.T.3, Danyl would have had to complete the orientation required by PatchWorks House. Id. at 113. Danyl never called to schedule the orientation or to set up visits. Id. The only time Danyl has even mentioned visiting with the children is when they are at court hearings. Id. at 114. Danyl had brought gifts for T.T.2 and T.T.3 at the June 2008 visits, but nothing since. Id. at 116. She provided a birthday cake for T.T.1 in September of 2009. Id. Danyl also had written letters for the children in the beginning, but stopped approximately four months after the children came into care. Id. at 118. Danyl has not provided any explanations as to why she has not visited. Id. at 118-19.

{¶30} Based upon the state of affairs between Danyl and Kevin as of the hearing date, returning the children would be returning them to Kevin. Id. at 120. In Cleveland's opinion, this would not be safe for the children. Id. Cleveland also indicated that she did not believe that Danyl was capable of protecting the children from Kevin or Brian. Id. Additionally, the children have been in the

care of the Agency for more than twelve out of the last 22 consecutive months. Id. at 122.

{¶31} Overall, Cleveland did not believe that the parents had diligently worked to complete the case plan. Id. at 125. They were offered free parenting classes, but did not complete them. Id. at 124. The Agency offered assistance with transportation to classes and visitation. Id. At 126. The parents rarely asked for any assistance. Id. Cleveland explained to Danyl what quitting her counseling before being satisfactorily discharged would mean to her chances of having her children returned. Id. at 128. Danyl insisted that she did not need counseling anymore. Id. Kevin has refused to facilitate Danyl's cooperation with the case plan and instead chooses to dismiss them. Id. at 129. Thus, Cleveland testified that it would be in the best interests of the children to have parental rights terminated. Id.

{¶32} Once the Agency had finished presenting its case, Danyl testified on her own behalf. She testified that she had done her best to take care of them and that the trial court should give her legal custody of the children. Oct. 14, 2009, Tr. 7. She testified that she had not visited with the children because of "the actual awkwardness of all this that I feel that we would get too emotional and wouldn't be able to sustain a required visit enough to show that we are at least, you know, wanting to visit each other, but we get too emotional and distressed

that I think it wouldn't be best." Id. at 8. She stated that she and Kevin had attended the PatchWorks orientation. Id. at 9. She would also like to visit T.T.1 at the Marsh Foundation. Id. Although Danyl testified that Kevin and Brian might have abused the children, she indicated that she still did not believe that the abuse had occurred. Id. at 9-10, 13. She did testify that she believed she could protect the girls from Brian if anything did happen. Id. at 12. She also testified that the ghosts had not followed her to the new home. Id. at 11. On cross-examination, Danyl admitted that she is not taking her medications or involved in counseling. Id. at 13. She believed that if the children were returned to the home, that Kevin would leave. Id. at 16. She would then require him to stay out of the house because of the things he says to the children. Id. at 17. She also testified that she did not believe there was anything more that the Agency could have done to help her. Id. at 20. She blamed her lack of progress on Kevin's interference. Id. at 21. Finally, Danyl testified that she quit going to counseling because her place was at home taking care of the household. Id. at 26.

{¶33} James Melle ("Melle"), Danyl's GAL in this case, also testified. Id. at 38. Melle testified that he does not believe that Danyl understood everything that was discussed. Id. at 39. He believes she understands that she has a mental health issue, but does not understand the depth of it. Id. In his opinion, Danyl is not capable of identifying what assistance she needs. Id. at 40. Melle testified

that in his opinion, it would be in Danyl's best interest to grant permanent custody of the children to the Agency. Id. Based upon Danyl's mental health disorder, her lack of medication, her intellectual limitations, and the depth of the problems the children have, the additional stress of raising the children would not be in her best interest. Id. at 40-41.

{¶34} At the conclusion of the hearing on October 14, 2009, the magistrate made the following statements.

> **Taking into consideration the evidence that's been presented over the last three days, the exhibits, testimony, I will deny mother's motion for legal custody; I will grant the Agency's motion for permanent custody of all three children and so direct them to complete the Case Plan for the permanent custody.**
>
> **I'll issue my decision with the appropriate findings, law, etcetera, further. Thank you.**

Id. at 78. No other findings were made in open court. On November 19, 2009, the magistrate filed her extensive and thorough decision recommending that the Agency's motion for permanent custody of the children be granted.[3] Danyl filed her objections to the magistrate's decision on December 3, 2009, and filed a supplemental objection on January 7, 2010. The Agency filed its response to the objections on January 29, 2010. On April 5, 2010, the trial court overruled the objections, adopted the magistrate's findings, and granted permanent custody of

---

[3] The magistrate's decision was 44 pages, discussed all of the testimony, made extensive findings of fact, and addressed all relevant factors in R.C. 2151.414(D), (E), when setting forth the conclusions of law.

the children to the Agency.  Danyl filed her notice of appeal on April 30, 2010, and raises one assignment of error.

> **[The Agency] failed to use reasonable efforts to reunite the children with [Danyl].**

{¶35} The right to raise one's own child is a basic and essential civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169.  "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6.  These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed.  Id.   When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414.  These requirements include in pertinent part as follows.

> **(B)(1)  Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **\* \* \***
>
> **(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**For the purpose of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**

**(2) With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C) In making the determination required by this section * * *, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**

**\* \* \***

**(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * *, the court shall consider all relevant factors, including, but not limited to, the following:**

**The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**

**The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**\* \* \***

**In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(e) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(2)    Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated within one year after the court holds the hearing pursuant to division (A) of this section * * *;**

**\* \* \***

**(4)    The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \* \***

**(16)   Any other factor the court considers relevant.**

R.C. 2151.414.

{¶36} In her assignment of error, Danyl claims that the Agency failed to create a case plan designed to allow her to reunify with her children. She argues that due to her limited cognitive abilities, the Agency should have provided her with extra assistance. The extra assistance she argues should have been provided was for the Agency to separate her from Kevin.

{¶37} The Agency is required to make reasonable efforts to allow for the return of children to the home. R.C. 2151.419. The requirements of the case plan, as it applies to Danyl, in this case were that Danyl attend parenting class, visit with the children, attend a class on budgeting, receive a psychological evaluation and follow the recommendations from that evaluation. Additionally,

Danyl was required to be evaluated by MRDD to determine if she was eligible for any further assistance. The record indicates that the only requirement Danyl completed was to have a psychological evaluation. The result was that she was diagnosed as having the beginning stages of schizophrenia. Medication was prescribed for her to treat the illness, but Danyl, at Kevin's urging, decided not to take the medication anymore. As a result the "ghosts" continued to talk to her and she continued to do what they told her. After they moved, the ghosts did not come with her, but no other changes occurred. Danyl also did not continue with the counseling for her mental health issues. Her last visits with T.T.2 and T.T.3 were in June of 2008, more than a year before the hearing. Her last visit with T.T.1 was in October or November of 2008, again almost a year before the hearing. Danyl did not complete any parenting or budgeting classes and was terminated from the program at Firelands for failure to progress. Additionally, Danyl did not even maintain contact with the caseworker or request information on her children. She refused to acknowledge that Brian was sexually abusing her children or that Kevin was abusive as well. Thus, she was not able to move forward to learn to protect the children. At the hearing, Danyl admitted that the Agency had done everything they could to help her. Danyl also admitted that she knew what the Agency wanted her to do. Although Danyl argues the Agency could have separated her from Kevin, no authority for doing so is provided.

Danyl is not legally incompetent and thus cannot be forced to leave the man she calls her common law husband. When Danyl brought it to the Agency's attention that she might want to leave, they offered to help her. Her response was that she would let them know. However, she never told the caseworker that she wanted to leave. Instead, when contacted, she continued in her same role as before. Given all of the evidence before it, the trial court did not err in determining that the Agency had made reasonable efforts to reunite Danyl with her children. The assignment of error is overruled.

{¶38} Having found no error prejudicial to Danyl, the judgments of the Court of Common Pleas of Seneca County are affirmed.

***Judgments Affirmed***

**ROGERS and SHAW, J.J., concur.**

**/jlr**